UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RTP LLC, a Michigan Limited Liability )
Company and INHERITANCE CAPITAL )
GROUP, LLC n/k/a REAL ESTATE )
OPPORTUNITY FUND I, LLC, a Michigan )
Limited Liability Company, )
           )
                Plaintiffs, )
           )
             v. )           13 C 350
           )
ORIX REAL ESTATE CAPITAL, INC., )
           )
               Defendant. )

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This matter comes before the Court on the cross-motions for summary judgment submitted by Plaintiffs' RTP LLC ("RTP") and Inheritance Capital Group LLC ("Inheritance"), d/b/a W&D Real Estate Opportunity Fund I, LLC ("W&D Real Estate Opportunity") ("collectively Plaintiffs") and Defendant ORIX Real Estate Capital, Inc., ("ORIX"), pursuant to Federal Rule of Civil Procedure 56. Plaintiffs have filed motions in limine and motions to strike. ORIX has also filed motions to strike. For the reasons set forth below, ORIX's motion for summary judgment is granted and the motion to strike is denied. Plaintiffs' motion for summary judgment is denied and their motions in limine and motions to strike are also denied.

# BACKGROUND

The following facts are derived from the parties' respective statements and exhibits filed pursuant to Northern District of Illinois Rule 56.1 ("Local Rule 56.1"). The Court reviews each Local Rule 56.1 statement and disregards any argument, conclusion, or assertion unsupported by the evidence in the record.

This case involves a commercial real estate loan issued by ORIX to RTP. RTP and Inheritance are limited liability companies organized under the laws of Michigan. ORIX is a corporation organized under the laws of Delaware and authorized to do business in Illinois. On September 27, 2007 ("Closing Date"), ORIX and RTP executed a Loan Agreement in which RTP would borrow $41,250,000.00 ("Loan") for the purchase of a commercial property in Durham, North Carolina ("Property"). The Loan from ORIX to RTP was evidenced by a Purchase Money Note, Guaranty, Mortgage on the Real Property and Assignment of Rents (collectively "Loan Documents"). In conjunction with the loan closing, Inheritance executed a Guaranty in favor of ORIX, making Inheritance also liable for the Loan.

The Loan Documents laid out numerous contractual provisions that governed the ownership structure of the Plaintiffs. RTP was specifically formed to be a "Single Purpose Entity," which requires that the business have no function other than to own and operate the Property, which served as the collateral for the Loan. The Loan Agreement prohibited RTP from owning any assets, other than the Property, and from having any indebtedness other than the Loan. RTP did not have any employees and

therefore it could not manage itself. Absent the ability to manage itself, additional layers of governing structure were required. The Operating Agreement of RTP dictated that it would be managed by a second limited liability company: ICG Ellis Road, LLC ("ICG Ellis Road").

Like RTP, ICG Ellis Road was formed as a "Single Purpose Entity." The ICG Ellis Road Operating Agreement specifies that its sole purpose is to "own an interest in RTP LLC and to serve as its manager." The ICG Ellis Road Operating Agreement also provided that the business affairs would be managed by two individuals, Robert Shumake ("Shumake") and Adrienne Lance Lucas ("Lucas"). The signatures of both Shumake and Lucas appear on the Note, the Loan Agreement and the Deed of Trust on behalf of ICG Ellis Road, acting as the managers of RTP.

ICG Ellis Road was not the only manager of RTP. RTP, through the authorization of ICG Ellis Road, entered into an additional management agreement with Redico. Redico was the asset manager of the Property and was given limited managerial duties. The Redico Management Agreement provided the specific services which Redico would provide in managing the Property. However, Redico did not have the ultimate control in making managerial decisions for RTP under the Redico Management Agreement. In some instances Redico had to seek approval from RTP to perform certain managerial functions, which required all requests for RTP's approval to be forwarded to ICG Ellis Road, who was the overarching manager of RTP.

The ownership structure of the corporate entities involved in the transaction were further delineated. As reflected in ICG Ellis Road's Operating Agreement, Inheritance owned 100% of ICG Ellis Road. The Loan Agreement provides in Article 5.1.5(b) that Inheritance, through its ownership and control of ICG Ellis Road, would manage the Property except to the extent that certain services were delegated to Redico. On the Closing Date, as indicated in the Inheritance Operating Agreement, Inheritance was managed by a separate entity, ICG Real Estate Advisors LLC ("ICG Real Estate Advisors"), which Shumake and Lucas also managed. The equity membership interest in Inheritance was owned by two pension funds: General Retirement System of the City of Detroit and the Police and Fire Retirement System of the City of Detroit ("PFRSCD") (collectively "Pension Funds"). Concisely, the ownership structure delineated in the Loan Agreement is as follows: (1) the Pension Funds owned Inheritance; (2) ICG Real Estate Advisors managed (through Shumake and Lucas) Inheritance; (3) Inheritance owned ICG Ellis Road; (4) ICG Ellis Road owned the majority interest in and was the manager (through Shumake and Lucas) of RTP; and (5) Redico managed the Property pursuant to the Redico Management Agreement, subject to the supervision of ICG Ellis Road. This highly structuralized system of ownership and management was reflected in a schematic diagram included in the Loan Agreement as Exhibit C.

The corporate structure established in the Loan Agreement was not limited to Exhibit C. The Loan Agreement required that none of the limited liability companies

could amend their operating agreements without ORIX's prior written consent and none of the entities could file for bankruptcy protection without breaching the Loan Agreement. Additionally, the Loan Agreement dictated that the management of the Property, either directly or indirectly, could not be changed without ORIX's prior written consent. The prohibition against changing management also extended to the entities changing their names. The Loan Agreement mandated that each of these requirements must remain accurate until the loan was paid in full and any breach would be deemed an "Event of Default." If an Event of Default was deemed to have occurred, the Loan Agreement called for the exercise of a Cash Trap Event, which entitled ORIX to seize the rental payments provided by the tenant of the Property. When the loan was made, the Property was leased to Reichhold Inc. ("Reichhold"). The Loan Agreement defines a Cash Trap Event in pertinent part as "the occurrence of an Event of Default under Section 7.1(a) or any other Event of Default of a material non-monetary obligation of Borrower under the Loan Documents as determined by the Lender (ORIX)."

After the Loan Agreement was executed and the transaction was finalized, numerous changes occurred to the corporate structure established in the Loan Agreement, unbeknownst to ORIX. On September 2, 2010, the Secretary of State of North Carolina issued a Certificate of Revocation of Registration concerning RTP's ability to transact business in North Carolina. Unrelated to the North Carolina Secretary of State determination, on September 10, 2010, PFRSCD one of the two

pension funds with an equity interest in Inheritance, filed a lawsuit in Michigan state court ("Michigan Lawsuit") against ICG Real Estate Advisors and Inheritance for breach of contract. The lawsuit was precipitated by Shumake, who managed the assets of Inheritance through ICG Real Estate Advisors. PFRSCD alleged that Shumake intended to transfer the assets of Inheritance into a real estate investment trust without their consent. On September 13, 2010, the Michigan state court entered a Temporary Restraining Order ("TRO") enjoining ICG Real Estate Advisors from transferring the Property. The following day on September 14, 2010, PFRSCD sent a written notice to ICG Real Estate Advisors advising that it was in material breach of the Inheritance Operating Agreement. The earlier TRO was replaced by a TRO Stipulation on September 23, 2010. On January 20, 2011, PFRSCD filed an amended complaint against ICG Real Estate Advisors and Shumake alleging that he had engaged in fraud during the course of his management of the Pension Funds. The initiation of the Michigan Lawsuit began more than eight months of litigation. During the pendency of the Michigan Lawsuit, Redico was unaware of the litigation involving ICG Ellis Road. Redico's agent Jackie Paul stated that Shumake and Lucas, while acting as the managers of ICG Ellis Road, were not responsive to Redico during this time. Redico first became aware of the Michigan Lawsuit on May 17, 2011.

In January and February 2011, the Pension Funds each passed resolutions removing ICG Real Estate Advisors as the manager of Inheritance and replacing it with W&D Real Estate Opportunity Fund I Manager, LLC ("W&D Real Estate").

With this change to W&D Real Estate, Shumake and Lucas were replaced with Paul Bernard ("Bernard") and W. Battle Williford ("Williford"). After the change was solidified in February 2011, the replacement was completed on May 9, 2011 when the Michigan court entered a final Enforcement Order.

In March 2011, W&D Real Estate executed an amendment to the Inheritance Operating Agreement in which the name of Inheritance was changed to W&D Real Estate Opportunity. As the corporate entities at the top of the corporate structure changed their name, ICG Ellis Road, the manager of RTP, followed suit. In June 2011, ICG Ellis Road changed its name to W&D Ellis Road, LLC ("W&D Ellis Road"). The name change was reflected in the ICG Ellis Road Operating Agreement, which also indicated that two new managers had replaced Shumake and Lucas in managing ICG Ellis Road: Bernard and Williford. Following its name change, ICG Real Estate Advisors declared bankruptcy in April 2012.

ORIX was unaware of any of the changes that had been made to the corporate entities delineated in the Loan Agreement until August 2012. On August 27, 2012, ORIX received an audit letter from a third party, Walker & Dunlop ("W&D") stating that ICG Ellis Road had been restructured and its name had been changed to W&D Ellis Road. Following the receipt of the audit letter, ORIX conducted its own investigation into the validity of the audit letter and thereafter deemed the structural corporate changes to be an Event of Default under the Loan Agreement. On September 10, 2012, ORIX sent notice to RTP that they had engaged in conduct

which was construed to be in breach of their Loan Agreement and a Cash Trap Event would be declared. The September 10, 2012 breach notification erroneously stated that the Cash Trap Event was based on the anticipatory breach of the Loan Agreement, premised on Reichhold not renewing their lease in January 2013. A further letter was sent by ORIX on September 28, 2012, which corrected and clarified the previous notification with the circumstances that ORIX deemed to be the basis for the Events of Default. The following month, on October 18, 2012, ORIX enforced the Cash Trap Event breach provision and Reichhold's rental payments were secured by ORIX. A prolonged series of litigation ensued.

On December 17, 2012, Plaintiffs filed a complaint in the Circuit Court of Cook County, Illinois ("Cook County Case") alleging claims for breach of contract, conversion and seeking declaratory relief. In January 2013, ORIX removed RTP's Cook County Case to this Court, based on Diversity Jurisdiction. See 28 U.S.C. § 1332(a). Plaintiffs' five-count amended complaint alleges; (1) a breach of contract claim by RTP; (2) RTP seeks a declaratory judgment establishing the invalidity of ORIX's claims; (3) a claim of conversion by RTP; (4) a claim of breach of good faith and fair dealing claim by RTP; and (5) Inheritance seeks a declaratory judgment finding that they are not liable as a Guarantor to the Loan Agreement. On January 23, 2013, ORIX filed a one-count counterclaim alleging that RTP and Inheritance are joint and severally liable under the Loan Agreement Guaranty for the indebtedness and other obligations of the Cash Trap Event.

On March 8, 2013, ORIX filed a non-judicial foreclosure action in North Carolina ("North Carolina Foreclosure Action"). While the North Carolina Foreclosure Action was pending, RTP filed a separate lawsuit in North Carolina seeking to enjoin the foreclosure suit. On April 30, 2013, the North Carolina court having jurisdiction over RTP's claims entered an order enjoining ORIX's North Carolina Foreclosure Action. On December 18, 2013, RTP and Inheritance entered into a loan modification agreement changing the maturity date on the Note from January 31, 2014 to December 18, 2013. On January 6, 2014, the court in the North Carolina Foreclosure Action entered an Order authorizing foreclosure and set the date of the foreclosure sale for January 28, 2014. The sale was ultimately performed on February 27, 2014.

In the instant matters before this Court, on April 4, 2014, ORIX moved for summary judgment and Plaintiffs moved for partial summary judgment. On July 1, 2014, the Court held oral argument on the parties' motions for summary judgment. Both motions are ripe for disposition.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings, discovery, disclosures, and affidavits establish that there is no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Winsley v. Cook Cnty.*, 563 F.3d 598, 602–03 (7th Cir. 2009). The moving party bears the initial burden of showing that no genuine issue of material fact exists.

*Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the non-moving party to show through specific evidence that a triable issue of fact remains on issues on which the non-movant bears the burden of proof at trial. *Id.* The non-movant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; he must go beyond the pleadings and support his contentions with proper documentary evidence. *Id.* The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. *Bay v. Cassens Transport Co.,* 212 F.3d 969, 972 (7th Cir. 2000). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When parties file cross-motions for summary judgment, each motion must be assessed independently, and denial of one does not necessitate the grant of the other. *M. Snower & Co. v. United States*, 140 F.2d 367, 369 (7th Cir.1944). Rather, each motion evidences only that the movant believes it is entitled to judgment as a matter of law on the issues within its motion and that trial is the appropriate course of action if the court disagrees with that assessment. *Miller v. LeSea Broadcasting, Inc.*, 87 F.3d 224, 230 (7th Cir.1996). With these principles in mind, we turn to the parties' motions.

**DISCUSSION**

Plaintiffs' motion for partial summary judgment does not specify the claims that they are seeking judgment on. ORIX moves for summary judgment on all claims presently before the Court. The parties do not dispute that Illinois law governs the disposition of all claims. *See Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) ("Courts do not worry about conflict of laws unless the parties disagree on which state's law applies.").

## I. Plaintiffs' and ORIX's Motions to Strike and Motions in Limine

As a preliminary matter, Plaintiffs and ORIX have filed numerous motions to strike and motions in limine to limit the evidence the Court considers in resolving the issues presented by the parties in their respective cross-motions for summary judgment. The parties argue that the opposing sides evidence is not in compliance with the applicable local rules, contains numerous hearsay statements, improperly authenticated exhibits, includes impermissible legal conclusions, and many declarations are not based on personal knowledge. This Court has considered both Plaintiffs' and ORIX's motions to strike and motions in limine. We review each Local Rule 56.1 statement and disregard any argument, conclusion, or assertion unsupported by the evidence in the record. The Court is mindful of its duty to assess the credibility of the evidence presented by both parties and only relies on relevant and admissible evidence when ruling on a motion for summary judgment. Plaintiffs'

motions in limine and motion to strike are denied. ORIX's motions to strike are also denied.

## II. Plaintiff's Motion for Summary Judgment

### A. RTP's Breach of Contract Claim

RTP argues that ORIX breached the Loan Agreement in deeming that numerous Events of Default occurred and instituting a Cash Trap Event, thereby taking all revenue from the Property. In Illinois to prove a breach of contract, RTP must establish: (1) the existence of a valid and enforceable contract; (2) RTP's performance; (3) ORIX's breach of the terms of the contract; and (4) damages resulting from the breach. *Lindy Lu LLC v. Ill. Cent. R.R. Co.*, 984 N.E.2d 1171, 1175 (Ill. App. 2013). The first element of RTP's breach of contract claim is undisputed. However, ORIX contests that RTP rendered performance, was itself responsible for the breach of the Loan Agreement, and that RTP suffered damages.

ORIX argues that it was entitled to declare the September 2012 Cash Trap Event based on numerous Events of Default which occurred under the Loan Agreement. ORIX claims that it was RTP who breached the Loan Agreement and ORIX was merely exercising its contractual remedies for a breach of contract. To resolve RTP's breach of contract claim and determine RTP's performance the Court must first determine if any of the occurrences which ORIX claims began in September 2010 gave rise to an Event of Default under the Loan Agreement.

Instrumental in determining if an Event of Default occurred is understanding the parameters of the corporate structure that was established in the Loan Agreement. ORIX asserts that they specifically bargained for the over expansive ownership structure of corporate entities that they specifically delineated in Exhibit C, a schematic diagram of a distinct corporate hierarchy that was attached to and mentioned in the Loan Agreement. RTP conversely argues that Exhibit C, with a singular reference in the Loan Agreement, was not properly incorporated into the Loan Agreement. RTP further contends that absent Exhibit C, the Loan Agreement does not establish or require a designated corporate hierarchy of ownership and management, which had to be maintained.

At the outset, the Court will examine if Exhibit C was properly incorporated into the Loan Agreement. Under Illinois law, a document is incorporated by reference into the parties' contract only if the parties intended its incorporation. *See Wilson v. Wilson*, 577 N.E.2d 1323, 1329 (Ill. App. 1991); *188 LLC v. Trinity Industries, Inc.*, 300 F.3d 730, 736 (7th Cir. 2002). Illinois requires that incorporation be clear and specific. *See, e.g., Kirschenbaum v. Northwestern Univ.*, 728 N.E.2d 752, 762 (Ill. App. 2000) ("Contracts which specifically incorporate other documents by reference are to be construed as a whole with those other documents."). The party seeking to enforce the terms of the purported incorporated document "must show . . . an intention to incorporate the document and make it a part of the contract." *Arneson v. Bd. of Trustees, McKendree Coll.*, 569 N.E.2d 252, 256 (Ill. App. 1991). If a contract

incorporates a specific document by name, both parties are on notice and are bound by the terms of that document. *See J.M. Process Sys., Inc. v. W.L. Thompson Elec. Co.*, 578 N.E.2d 264, 267 (Ill. App. 1991); *Wilson*, 577 N.E.2d at 1329-30; *Ridgeview Constr. Co. v. Am. Nat'l Bank & Trust Co.*, 563 N.E.2d 986, 990 (Ill. App. 1990). Under Illinois law, a party with actual knowledge of its contractual obligations cannot escape those obligations simply because an attachment was omitted from the written contract. *Burns v. Ford Motor Co.,* 331 N.E.2d 325, 329 (Ill. App. 1974).

The Loan Agreement discusses Exhibit C in Article 4.1.2(b), which states: "Exhibit C accurately depicts the ownership structure of the Borrower . . . ." Not only is Exhibit C prominently mentioned by name in Article 4.1.2(b), it is a portion of a larger body of attachments to the Loan Agreement. Exhibit C is not a stand-alone provision added ad hoc to the end of the Loan Agreement. The Loan Agreement references Exhibits A-F, throughout its numerous contractual provisions with the Exhibits included in alphabetical order at the end of the Loan Agreement. The Court finds that Exhibit C was clearly named and was intended to be incorporated into the Loan Agreement. Additionally, given the elaborate structure and relationship of all the entities and their involvement with the Property as described earlier, it was essential to include such a chart to afford a reasonable and necessary comprehension of the rights and obligations of all the entities and persons involved.

Even assuming arguendo that Exhibit C was not incorporated into the Loan Agreement, the Court will consider RTP's argument that the Loan Agreement did not

delineate a corporate hierarchy of managers and owners, aside from RTP being managed by ICG Ellis Road and Redico. To properly understand the corporate structure that was bargained for, it is essential to inspect several provisions of the Loan Agreement as well as numerous of the defined terms imbedded in those provisions. After mentioning Exhibit C, which for present purposes will not be considered, the Loan Agreement in Article 4.1.2(b) states: "Each Borrower Party has the requisite authority to execute, deliver and carry out the terms and provisions of the Agreement, the Loan Documents and other documents to be executed and delivered by Borrower and each Guarantor, as applicable, pursuant to the agreement." The Borrower Party referenced above is defined as collectively, the Borrower, each Authorizing Entity and each Guarantor. The term Borrower Party expands the scope of the corporate structure to encompass Authorizing Entities. Article 1.2 of the Loan Agreement defines Authorizing Entity as follows: "Authorizing Entity means each corporation, partnership, limited partnership, limited liability company or other legal entity whose consent or authorization is required for Borrower to enter into, and perform its obligations under, this Agreement and the other Loan Documents." After reviewing to the Loan Agreement to establish the bounds of the corporate structure, we now turn to applying the aforementioned terms to the corporate entities involved in the transaction.

The Loan Agreement designates RTP as a Single Purpose Entity. As a Single Purpose Entity, RTP was specifically designed to own and operate the Property. RTP

did not have any other business function.  RTP did not have any employees and therefore was reliant on another entity to manage it.  RTP relied on ICG Ellis Road, another Single Purpose Entity, to act as its manager.  ICG Ellis Road's Operating Agreement establishes that its sole purpose was to own an interest in RTP and serve as its manager.  This limited corporate structure is what RTP contends the Court should relegate its consideration to.  However, this limited hierarchy ignores the overarching ownership structure that RTP and ICG Ellis Road were required to adhere to in order to gain authorization to enter into the Loan.

RTP concedes that ICG Ellis Road was an Authorizing Entity, but contests that Inheritance and ICG Real Estate Advisors should be included as Authorizing Entities. On the Closing Date, as part of the Loan Agreement, Inheritance, ICG Ellis Road and ICG Real Estate Advisors each executed a written Consent in Lieu of Meeting.   The Consent in Lieu of Meetings submitted by Inheritance, ICG Ellis Road, and ICG Real Estate Advisors were authorizations submitted by the management bodies of each entity.  This ultimately gave the authority for RTP to enter into the Loan Agreement.

ICG Ellis Road was the manager of RTP, and ICG Ellis Road submitted a Consent in Lieu of Meetings which authorized RTP to enter into the Loan Agreement. Further up the corporate hierarchy, Inheritance owned ICG Ellis Road and Inheritance was managed by ICG Real Estate Advisors.   Therefore, Inheritance through its managers, ICG Real Estate Advisors, executed a Consent in Lieu of Meeting which allowed ICG Ellis Road, to authorize RTP's execution of the Loan on the Closing

Date. These consents and authorizations fall squarely into what was contemplated by the Loan Agreement's definition of an Authorizing Entity. Without the upper echelons of ownership (Inheritance) and management (ICG Real Estate Advisors) authorizing the lower tiers of the hierarchy, ICG Ellis Road and RTP would not have the power to enter into the Loan Agreement. The Court finds that Inheritance, ICG Real Estate Advisors and ICG Ellis Road are all Authorizing Entities.

### a. RTP's Performance

RTP contends that it substantially performed its contractual duties and ORIX was in breach of the Loan Agreement when it exercised the Cash Trap Event in October 2012. Conversely, ORIX argues that RTP cannot establish that it rendered performance under the Loan Agreement due to the fact that RTP was in breach of the Loan Agreement after multiple provisions were violated between the Closing Date and September 2012. Both parties argue that the other party's performance was deficient and in breach of the Loan Agreement. The Court will proceed to review the multitude of occurrences that both parties argue have different legal ramifications under the Loan Agreement.

### 1. Certificate of Revocation

In September 2010, the Secretary of State of North Carolina issued a Certificate of Revocation of Registration against RTP, prohibiting the entity from conducting business in the state of North Carolina. RTP did not seek or receive reinstatement until January 2013. ORIX argues that the Secretary of State's revocation violated

Article 4.1.2(a) of the Loan Agreement. Article 4.1.2(a) states, "Borrower (RTP) is duly formed, validly existing and in good standing under the laws of the State of its organization and is qualified to do business in the State in which the Property is located." Under Article 4.1, this covenant was required to remain true until the Loan was paid in full.

RTP argues that as it presently stands, it has now been authorized to do business in North Carolina, due to its January 2013 reinstatement. RTP fortifies its argument with the North Carolina Secretary of State's determination of its business status as "Current-Active" with an Effective Date of September 20, 2007. It appears that the North Carolina Secretary of State relies on the original date of registration, in this instance September 2007, in deeming an Effective Date of Registration after a reinstatement. Even though the North Carolina Secretary of State deems RTP's reinstatement to be a retroactive cure for its revocation, this does not cure an unambiguous contractual provision of the Loan Agreement, which does not contain a clause allowing for a retroactive cure. From September 2010 until January 2013, RTP was not qualified to do business in North Carolina in violation of Article 4.1.2(a) of the Loan Agreement.

RTP's failure to maintain its ability to do business in the state of North Carolina was in breach of Article 4.1.2(a) of the Loan Agreement, which gave rise to an Event of Default under Article 7.1(b) and (c) of the Loan Agreement. Pursuant to

the definition of a Cash Trap Event, an Event of Default of a non-monetary obligation of RTP, as determined by the ORIX, is grounds for exercising a Cash Trap Event.

### 2. PFRSCD's September Lawsuit against ICG Real Estate and Inheritance

On September 10, 2010, PFRSCD commenced the Michigan Lawsuit due to Shumake's notification to the Pension Funds of his intent to transfer the assets of Inheritance into a real estate investment trust without its consent. On September 13, 2010, the court in the Michigan Lawsuit, entered a TRO, which enjoined ICG Real Estate Advisors and Inheritance from transferring any assets or property. ORIX argues that the filing of the Michigan Lawsuit, and consequently the imposition of the TRO, constituted an Event of Default under the Loan Agreement. ORIX was not given contemporaneous notice of the lawsuit or entry of the TRO.

In Article 4.1.2(g) of the Loan Agreement, RTP represented that "there are no actions, suits or proceedings pending or, to Borrower's knowledge, threatened against or affecting Borrower or Guarantor . . . which could reasonably be expected to have a Material Adverse Effect on Borrower or such Guarantor." Through Article 4.1 of the Loan Agreement, RTP represented that the previous covenant would remain true until the Loan was paid in full. RTP contends that there was no breach of Article 4.1.2(g) and even if there was a breach, it would not meet the threshold requirement of having a Material Adverse Effect on the Property, as required by the Loan Agreement. First, RTP argues that Article 4.1, which warrants that all provisions remain the same for the life of the Loan, was exclusively directed to the actions of the Borrower, RTP.

Therefore, RTP had no authority to control the Pension Funds and their choice of defendants in the September 2010 lawsuit. Article 4.1.2(g) clearly lays out that there were no suits "against or affecting [the] Borrower or Guarantor." When combined with the perpetuity of Article 4.1, which requires compliance until the Loan is paid in full, the Michigan Lawsuit against Inheritance, the Loan Guarantor, represents a breach of Article 4.1 of the Loan Agreement.

Furthermore, RTP argues that the Michigan Court's injunction against Inheritance and its subsidiaries from transferring assets did not have a Material Adverse Effect on the Property as required under Article 4.1.2(g) of the Loan Agreement. RTP contends that it is not a subsidiary of Inheritance and thus, the Property was not affected by the TRO. The Loan Agreement defines subsidiary as an entity of which a corporation would be the direct or indirect parent entity. RTP's argument is contradictory to the record. Initially, the W&D Audit Letter received by ORIX in August 2012 states that Inheritance (under the current name of W&D Real Estate Opportunity) "holds RTP LLC in its portfolio." Secondly, the Inheritance Guaranty, executed in conjunction with the Loan closing, explicitly states that Inheritance has an interest in RTP and has a financial interest in the Property. The record is clear that Inheritance did indeed have an interest in RTP and held RTP in its investment portfolio. We determine that RTP was a subsidiary of Inheritance.

ORIX argues that the TRO had a Material and Adverse Effect on the property as defined in the Loan Agreement. Looking to the Loan Agreement, Material Adverse Effect:

> means that the matter in question *could reasonably be anticipated* to materially and adversely affect a party's ability to perform its obligations under the Loan Documents . . . or the value, cash flow or marketability of the Collateral, . . . or the business operations, economic performance, assets or condition . . . of the Borrower or any Guarantor (emphasis added).

After the Michigan court entered its TRO Stipulation in September 2010, PFRSCD amended its complaint against ICG Ellis Road and Shumake by alleging that Shumake had engaged in various manifestations of fraud. The TRO Stipulation prohibited the transfer of the assets of Inheritance or any of its subsidies. Inheritance held an interest in RTP and also held the company in its own portfolio. The Property was an asset of Inheritance and the imposition of the Michigan TRO Stipulation prohibited the Property's conveyance. A prohibition on the conveyance of the Property certainly would have an adverse effect on the marketability of the Property.

Furthermore, during the course of the Michigan litigation, Shumake and Lucas were not responsive to Redico, even though their oversight was required as the individual mangers of ICG Ellis Road. For all practical purposes Redico was rendered powerless without the ability to effectuate managerial decisions in the absence of ICG Ellis Road. The lack of Shumake's oversight as an individual

manager of ICG Ellis Road during the Michigan litigation could be anticipated to affect the RTP's business operations.

RTP's breach of Article 4.1.2(g) constituted an Event of Default under Article 7.1(b) and (c) of the Loan Agreement. Pursuant to the definition of a Cash Trap Event, an Event of Default of a non-monetary obligation of RTP, as determined by ORIX, is grounds for exercising a Cash Trap Event.

### 3. The Pension Funds Replace ICG Real Estate Advisors as the Manager of Inheritance and Appoint W&D Real Estate as the Replacement Manager

Following the filing of the Michigan Lawsuit, the Pension Funds in January and February 2011 passed a resolution removing ICG Real Estate Advisors as the manager of Inheritance. ICG Real Estate Advisors was replaced with W&D Real Estate. In conjunction with the change of corporate management, the individual managers of Inheritance were changed from Shumake and Lucas to Bernard and Williford. ORIX claims that this change in corporate and individual management violated Article 5.1.6(a) of the Loan Agreement. Article 5.1.6(a) sets forth in pertinent part that "Borrower shall not: (ii) suffer or permit (A) any change in the management (whether direct or indirect) of the Property . . . without in each case the prior written consent of the Lender." ORIX contends that the indirect management of RTP was changed because ICG Real Estate Advisors managed Inheritance, which indirectly managed the Property through its ownership of ICG Ellis Road. This structure is set forth in Article 5.1.5(b):

> At all times, [Inheritance] (through its one-hundred percent (100%) ownership and control of [ICG Ellis Road]) shall be in charge of executing [RTP's] business plan and shall exercise operational and management control, including day-to-day business decisions, with respect to the Property and the Project, except for those duties delegated to [Redico] under the [Redico] Management Agreement.

RTP makes two different arguments in an attempt to persuade the Court that Article 5.1.6(a) was not breached. First, RTP contends that the direct management of the Property never changed because it was always in the hands of Redico. RTP's argument does not contemplate the expanse of the prohibition on changing indirect management included in Article 5.1.6(a). Redico may have always played a role in the direct management of the Property, but Article 5.1.6(a) expressly stipulates that an indirect change in the management of the Property is prohibited.

Second, RTP attempts to minimize its power to acquiesce to the change in management. RTP contends that the wording of Section 5.1.6(a) limits its application to only actions it directly "suffer[s] or permit[s]." RTP's confined viewpoint neglects to consider its relationship with the other corporate entities established in the Loan Agreement. In conjunction with the corporate structure delineated in the Loan Agreement, ICG Ellis Road was formed as a Single Purpose Entity for the sole purpose of serving as the manager and partial owner of RTP. RTP did not have any employees and was formed as a Single Purpose Entity for the purpose of acting as the Borrower in the Loan Transaction. Since RTP was essentially an empty vessel, it relied on ICG Ellis Road and Redico for direct management. Indirect management

was accorded through ICG Real Estate Advisors and Inheritance as they were vested with the power to own, manage and operate ICG Ellis Road, and consequently RTP. The indirect management of the Property suffered a change when the management of Inheritance occurred.

RTP asserts that even though Inheritance's management underwent a change, the corporate lineage between Borrower (RTP) and Guarantor (Inheritance) remained the same. This limited intactness of the lower tiers of the corporate structure may be true but RTP does not account for the changes that were made to the highest tiers of the management structure. Even though Inheritance remained the sole owner of ICG Ellis Road and ICG Ellis Road remained the manager of RTP, it cannot be disputed that the overarching management of the whole structure changed when Inheritance received new management. The change in management at the top of the corporate structure corresponded to an indirect change of management which trickled down to RTP. The Loan Agreement's intermingling of corporate ownership and management structures resulted in an indirect change in management when one of the entities installed in the upper echelons was changed.

RTP's breach of the indirect management provision of Article 5.1.6(a) was an express Event of Default under Article 7.1(a) of the Loan Agreement. Pursuant to the definition of Cash Trap Event, RTP's breach of this covenant allowed ORIX to declare a Cash Trap Event.

## 4. Inheritance Amends its Operating Agreement to Change its Name

In March 2011, the Pension Funds and Bernard of W&D Real Estate amended the Inheritance Operating Agreement by changing the name of Inheritance to W&D Real Estate Opportunity. ORIX contends that Inheritance's amendment of its Operating Agreement and its name change were both a breach of Article 5.1.7(b) of the Loan Agreement. Article 5.1.7(b) states, in pertinent part, "Borrower shall not, without the prior written consent of Lender in each case, cause or permit (i) any amendment, replacement or termination of its Organizational Documents or the Organizational Documents of any Authorizing Entity . . . or (iv) any change in Borrower's or Authorizing Entity's state of formation or name."

Initially, RTP argues that Inheritance is not an Authorizing Entity and that RTP as the Borrower did not cause or permit the change instituted by Inheritance. As discussed above, the Court deems Inheritance as an Authorizing Entity that was subject to the requirements of Article 5.1.7(b). Having determined that Inheritance is an Authorizing Entity, we will determine if the changes that occurred in Inheritance's Organizational Documents or its name were prohibited by Article 5.1.7(b).

Organizational Documents are defined in the Loan Agreement as the documents creating or governing the Borrower or an Authorizing Entity. The Inheritance Operating Agreement sets out the managerial structure of Inheritance and discusses its governance as a corporate entity. Clearly, the Inheritance Operating

Agreement is an Organizational Document contemplated by the Loan Agreement. As an Authorizing Entity, Inheritance was also barred from changing its name.

RTP argues that it did not "cause or permit" any of the changes that were made to Inheritance and therefore could not violate the Loan Agreement. In March 2011, Bernard, acting under the auspices of W&D Real Estate, effectuated the changes to the name and Operating Agreement of Inheritance. At this point, a completely different manager from those listed in the Loan Agreement was instituting changes affecting the highest echelons of the corporate structure. While the changes were being made to Inheritance, Shumake was still formally the manager of ICG Ellis Road. As the manager of RTP, ICG Ellis Road had a duty under the Loan Agreement to inform ORIX of the changes that were occurring. It did not do so. The Court determines that RTP permitted the changes to Inheritance's Operating Agreement and its name change.

Inheritance's March 2011 amendment to its Organizational Documents and subsequent name change to W&D Real Estate Opportunity was a breach of Article 5.1.7(b) of the Loan Agreement. RTP's breach of Article 5.1.7(b) constituted an Event of Default under Article 7.1(a) of the Loan Agreement. Pursuant to the definition of Cash Trap Event, RTP's breach of this covenant allowed ORIX to declare a Cash Trap Event.

**5. ICG Ellis Road Amends Its Operating Agreement to Change Its Name and Appoint Bernard and Williford as Managers.**

In June 2011, ICG Ellis Road followed suit of the other corporate entities which controlled it and changed its name to W&D Ellis Road. In keeping with the divestment of the previous management regime, Shumake and Lucas were removed and Bernard and Williford were appointed to be the managers of the newly renamed W&D Ellis Road. ORIX propounds that these extensive changes to the entity directly involved with managing RTP constituted an Event of Default under the Loan Agreement. ORIX claims that RTP breached two provisions of the Loan Agreement: (1) Article 5.1.6(a), the Prohibition of Conveyances; and (2) Article 5.1.7(b), the clause dealing with a Change in Structure. RTP again counters that the Articles ORIX contends were violated narrowly prohibit only RTP from taking any action. RTP argues that it was not empowered to make any changes and therefore, it could not violate the Loan Agreement. We will discuss the alleged violation of each Article individually.

As we discussed above, Article 5.1.6(a) prohibits RTP from suffering or permitting any change of direct or indirect management of the Property. ORIX specifically ensconced two managers into ICG Ellis Road for the purpose of conducting RTP's business as set out in the Loan Agreement. Shumake and Lucas, as the managers of ICG Ellis Road, were the only individual managers mentioned in the Loan Agreement, which they signed. Shumake and Lucas were also responsible for executing various documents in conjunction with the Loan Closing on behalf of ICG

Ellis Road and ICG Real Estate which authorized RTP to enter into the Loan. As the individual managers of ICG Ellis Road, they were the direct managers of RTP. ICG Ellis Road's Operating Agreement states that the company "exists *solely* for the purpose of owning its interest in and serving as managers for RTP." (emphasis added). Absent any other responsibility, when ICG Ellis Road changed their management and replaced Shumake and Lucas for Bernard and Williford it was acting for RTP, as the entity could not act on any other basis. It is undisputed that ICG Ellis Road is an Authorizing Entity. The Court concludes that RTP violated Article 5.1.6(a) of the Loan Agreement by permitting ICG Ellis Road, an Authorizing Entity, to change its direct management.

As we discussed above, Article 5.1.7(b) prohibits RTP from causing or permitting any amendment to an Organizational Document of any Authorizing Entity or from changing the name of an Authorizing Entity. ICG Ellis Road was formed as a Single Purpose Entity for the sole purpose of serving as the manager and partial owner of RTP. Without the ability to act outside of the scope of its management of RTP, ICG Ellis Road amended its Operating Agreement acting for RTP. We previously determined that the Organizational Documents defined in the Loan Agreement included Inheritance's Operating Agreement. Looking to ICG Ellis Road's Operating Agreement, it is clear that the document also governs the function of ICG Ellis Road, and therefore it is an Organizational Document as contemplated by the Loan Agreement. The Court concludes that RTP violated Article 5.1.7(b) of the Loan

Agreement by permitting ICG Ellis Road, an Authorizing Entity, to amend its Organizational Documents.

RTP's breach of Article 5.1.6(a) and 5.1.7(b) constitutes an Event of Default under Article 7.1(a) of the Loan Agreement. Pursuant to the definition of Cash Trap Event, RTP's breach of this covenant allowed ORIX to declare a Cash Trap Event.

### 6. ICG Real Estate Advisors Files for Bankruptcy

In April 2012, ICG Real Estate Advisors filed for Chapter 11 bankruptcy. ORIX avers that RTP breached Article 4.1.2(e) of the Loan Agreement. Article 4.1.2(e) states: "No Borrower Party is insolvent and there is no: (i) assignment made for the benefit of the creditors of any of them; (ii) appointment of a receiver for any of them or for the property of any of them; or (iii) Insolvency Proceeding instituted by or against any of them." As already discussed Article 4.1, the proceeding covenant was required to remain true until the Loan was paid in full.

RTP argues that when ICG Real Estate Advisors filed for Bankruptcy in 2012 it had been removed as the manager of Inheritance. The consequence of Inheritance removing ICG Real Estate Advisors in 2011 was previously found to be a violation of the Loan Agreement. Regardless of Inheritance's actions on the Closing Date of the Loan the Loan Agreement, specifically prohibited Borrower Parties from instituting insolvency proceedings. The Loan Agreement defines a Borrower Party as any Authorizing Entity. As previously determined, ICG Real Estate Advisors is an Authorizing Entity. As an Authorizing Entity, ICG Real Estate Advisors covenants

were not extinguished at their ouster by Inheritance.  As a Borrower Party, ICG Real Estate Advisors was prohibited from instituting an insolvency proceeding until the Loan was paid in full.

RTP's breach of Article 4.2.1(e) constitutes an Event of Default under Article 7.1(h) of the Loan Agreement.  Pursuant to the definition of Cash Trap Event, RTP's breach of this covenant allowed ORIX to declare a Cash Trap Event.

### 7. RTP's failure to notify ORIX of any changes

ORIX contends that RTP violated Article 5.2.10 of the Loan Agreement. Article 5.2.10 states:

> Borrower (RTP) shall promptly upon acquiring knowledge thereof advise Lender (ORIX) of any default under any Material Agreement or any changes in the condition (financial or otherwise) of Borrower (RTP) that could reasonably be expected to have a Material Adverse Effect . . . or of the occurrence of any Default or Event of Default or the occurrence of any circumstance which would make any representation untrue or constitute a breach of any warranty in any material respect.

The tremendous amount of changes that were made to the corporate structure of RTP after the Loan Closing, at the very least, required RTP to inform ORIX of the changes.  In many instances, the individual managers of ICG Ellis Road (later W&D Ellis Road) facilitated the changes to the rest of the corporate structure and turned a blind eye to RTP's duty to report these changes to ORIX.  The record is devoid of any affirmative action on the part of RTP or ICG Ellis Road to inform ORIX of the changes occurring to the established corporate structure.

RTP's breach of Article 5.2.10 of the Loan Agreement constitutes an Event of Default under Article 7.1(a) and (b) of the Loan Agreement. Pursuant to the definition of a Cash Trap Event, an Event of Default of a non-monetary obligation of RTP, as determined by the ORIX, is grounds for exercising a Cash Trap Event.

The Court finds that RTP did not render performance sufficient to establish a claim for breach of contract. Furthermore RTP's actions violated a multitude of provisions in the Loan Agreement which constituted a breach of the Loan Agreement. The Court denies RTP's motion for summary judgment on its breach of contract claim and grants ORIX's motion for summary judgment.

## B. RTP's Request for a Declaratory Judgment

RTP seeks a declaration pursuant to the Illinois Declaratory Judgment Act, 735 ILCS 5/2-701, establishing: (1) that a Cash Trap Event cannot occur prior to Reichhold's lease renewal on January 31, 2013; (2) that none of the occurrences that ORIX claims were grounds for declaring the Cash Trap Events were in fact Events of Default under the Loan Agreement; (3) that ORIX did not have any contractual rights to take action against RTP; (4) that no Events of Default occurred; and (5) that ORIX breached its obligation under the Loan Agreement by declaring a Cash Trap Event in September 2012.

The requirements of "a declaratory judgment are (1) a plaintiff with a legal tangible interest; (2) a defendant having an opposing interest; and (3) an actual controversy between the parties concerning such interest." *Local 1894 v. Holsapple*,

559 N.E.2d 577, 584 (Ill. App. 1990). "For an actual controversy to exist, the case must present a concrete dispute . . . of an immediate and definitive determination of the parties rights, the resolution of which will aid in the termination of the controversy or some part thereof." *Adkins Energy, LLC v. Delta-T Corp.*, 806 N.E.2d 1273, 1276 (Ill. App. 2004). Where a claim for declaratory judgment presents the same issues as the remaining substantive claims, it serves no useful purpose and should be dismissed. *Vulcan Golf, LLC v. Google Inc.*, 552 F.Supp.2d 752, 778 (N.D. Ill. 2008); *Amari v. Radio Spirits, Inc.*, 219 F.Supp.2d 942, 944 (N.D. Ill. 2002). All issues RTP seeks to have established in a declaratory judgment have been previously discussed and have been deemed to be lacking in evidentiary support and merit. RTP's motion for summary judgment on Count II is denied. ORIX's motion for summary judgment on is granted.

### C. RTP's Claim of Conversion

RTP seeks to establish that ORIX was liable for the conversion of RTP's funds, when ORIX took all Revenues from the Property pursuant to the declaration of a Cash Trap Event. RTP argues that ORIX wrongfully, and without contractual authorization or right, took control of the Revenues. To establish a claim for conversion under Illinois law, RTP must show; (1) a right to the property; (2) an absolute and unconditional right to the immediate possession of the property; (3) a demand for possession; and (4) that ORIX wrongfully and without authorization assumed control, dominion, or ownership over the property. *Van Diest Supply Co. v. Shelby Cnty. State*

*Bank*, 425 F.3d 437, 439 (7th Cir. 2005) (citing *Cirrincione v. Johnson*, 703 N.E.2d 67, 70 (Ill. 1998)). For RTP to be successful in its conversion claim it must show that the money claimed to be taken, belonged at all times to RTP, and that ORIX converted it to its own use. *National Union Fire Ins. Co. Pittsburgh, Pa. v. Wilkins-Lowe & Co. Inc.*, 29 F.3d 337, 340 (7th Cir. 1994).

As discussed above in RTP's breach of contract claim, RTP cannot establish that ORIX improperly exercised the Cash Trap provision of the Loan Agreement because of RTP's multiple Events of Default. We have determined that RTP's actions constituted a breach of the Loan Agreement and ORIX's remedy for RTP's breach was the utilization of a Cash Trap Event. All monies recovered by ORIX beginning in October 2012, pursuant to the Cash Trap Event, are rightfully ORIX's money according to the Loan Agreement. RTP cannot establish a cause of action for conversion under Illinois law. RTP's motion for summary judgment on Count III is denied and ORIX's motion is granted.

### D. RTP's Breach of the Covenant of Good Faith and Fair Dealings Claim

RTP claims that ORIX breached its covenant of good faith and fair dealings when it deemed RTP's actions to be an Event of Default under the Loan Agreement and declared a Cash Trap Event. Under Illinois law, every contract carries the duty of good faith and fair dealings. *Cromeens, Holloman, Sibert, Inc., v. AB Volvo*, 349 F.3d 376, 395 (7th Cir. 2003). However, ORIX correctly points out that Illinois does not recognize an independent cause of action for breach of good faith and fair dealings.

*McArdle v. Peoria School Dist. No. 150*, 705 F.3d 751, 755 (7th Cir. 2013) ("the obligation of good faith and fair dealing is used as an aid in construing a contract under Illinois law, but does not create an independent cause of action."); *Wilson v. Career Educ. Corp.*, 729 F.3d 665, 674 (7th Cir.2013) (stating that "[t]he implied covenant of good faith is simply a breach of contract theory"); *Voyles v. Sandia Mortg. Corp.*, 751 N.E.2d 1126, 1130–31 (Ill. 2001). Because the breach of the duty of good faith and fair dealings is not an independent cause of action, and is merely a basis for a breach of contract action, which has been previously analyzed in our discussion of RTP's breach of contract claim, the Court grants ORIX's motion for summary judgment. RTP's motion for summary judgment is denied.

### E. Inheritance Request for a Declaratory Judgment

Inheritance also seeks a declaration under the Illinois Declaratory Judgment Act, 735 ILCS 5/2-701, establishing: (1) that no event described under Paragraph 1(b)(ii) of the Guaranty has occurred; and (2) Inheritance is not liable under Paragraph 1(b)(ii) of the Guaranty for the Indebtedness and other Obligations. Inheritance relies on ORIX's October 18, 2012 letter to Plaintiffs explaining the basis for exercising the Cash Trap Provision of the Loan Agreement and notifying Inheritance of its liability under Paragraph 1(b)(ii) of the Guaranty. The requirements of pursuing a Declaratory Judgment under Illinois law are familiar and described above. The Illinois Declaratory Judgment Act mandates that "[t]he court shall refuse to enter a declaratory judgment or order, if it appears that the judgment or order, would not

terminate the controversy or some part thereof, giving rise to the proceeding." 735 ILCS 5/2-701(a).

The Guaranty provides multiple provisions which may establish Inheritance's liability. ORIX has moved in its single counterclaim for the assessment of liability under the Guaranty against Inheritance. The entry of a Declaratory Judgment proclaiming a lack of Inheritance's liability under one specific provision would not terminate the issue of Inheritance's liability under other provisions, which ORIX has put into consideration with its single counterclaim. *See Wood v. School Dist. No.*, 309 N.E.2d 408 (Ill. App. 1974).

### III. ORIX's Motion for Summary Judgment

#### A. ORIX's Enforcement of the Guaranty

ORIX seeks to hold RTP and Inheritance jointly and severally liable for all Indebtedness, Obligations, and Losses and Expenses that have been incurred by RTP's breach of the Loan Agreement, pursuant to the Guaranty. In conjunction with the Loan closing, Inheritance executed a Guaranty. Paragraph 7(q) of the Guaranty establishes that Inheritance, as the Guarantor, shall be joint and severally liable for all obligations of RTP and for all or any part of the Indebtedness or Obligations. ORIX argues that after numerous Events of Default occurred RTP distributed cash and assets in violation of Provision 1(b)(ix) of the Guaranty. Provision 1(b)(ix) of the Guaranty provides:

> 1. Liabilities. Notwithstanding any exculpation or other
> provision in any Loan Document to the contrary, Guarantor

(Inheritance) agrees to be personally liable for the payment and satisfaction of each and all of the following (collectively, "Guarantor's Liabilities"):

(b)     Without limiting the generality of subparagraphs (a) or (b) above, all the Indebtedness and other Obligations (Including Losses and Expenses) in the event of:

(ix)    any distributions by Borrower (RTP) of cash or assets after an Event of Default or the occurrence of a Cash Trap Event.

Inheritance argues that Provision 1(b)(ix) is unenforceable under Illinois law due to its conflict with the more narrowly tailored Guaranty Provision, 1(a)(x). Provision 1(a)(x) of the Guaranty provides that ORIX is entitled to "Losses and Expenses"  arising from "any use of Revenues generated after the occurrence of any Cash Trap Event or Default for purposes other than payment of usual and customary operating expenses of the Property or the Indebtedness."  Inheritance insists that there is an ambiguity between Guaranty Provision 1(a)(x) and 1(b)(ix), which mandates the Court to enforce effect to Provision 1(a)(x), the more specific term. *See Brzozowski v. Northern Trust Co.*, 618 N.E. 405, 409 (Ill. App. 1993).

When comparing both provisions, it is apparent that there is no ambiguity and that the two provisions deal with the imposition of different liabilities.  *See Bruno Benedetti & Sons, Inc. v. O'Malley*, 464 N.E.2d 292, 297 (Ill. App. 1984) ("[I]n construing a contract, it is presumed that all provisions were inserted for a purpose, and conflicting provisions will be reconciled if possible so as to give effect to all of the contract's provisions.").  Provision 1(a)(x) only entitles ORIX to recover Losses and Expenses when Revenues are used for purposes other than the payment of the

- 36 -

usual and customary operating expenses, after the occurrence of a Cash Trap Event. Losses and Expenses are defined in the Guaranty as:

> (a) all losses, damages, direct or consequential, and liabilities which Lender or any subsequent holder of the Note may pay or incur, . . . and the cost of appraisals, site investigation, engineering reports and surveys, audits or other investigations and (b) all reasonable attorneys' fees, court costs and other legal expenses and all other costs and expenses of any kind which Lender . . . may pay or incur in attempting to collect, compromise, or enforce, in any respect any Guarantor's Liabilities . . . .

As defined in the Guaranty, Loses and Expenses are expenses which are incurred in the collection of any outstanding balance after an Event of Default. On the other hand, Indebtedness and Obligation which are included in Provision 1(b)(ix) relate to the reimbursement of the original Loan and interest in arrears. Indebtedness is defined in the Loan Agreement as "all obligations of the Borrower to Lender from time to time for the payment of money, including without limitation, the principal amount of the Loan outstanding . . ." all Accrued Interest, all Charges and all amounts expended by Lender or on its behalf which Borrower is obligated to reimburse . . . ." The Loan Agreement also defines Obligations as, "all or any payment or performance obligations of Borrower or Guarantor to Lender under the Loan Documents." Since Provision 1(a)(x) and 1(b)(ix) address different liabilities the Court is not inclined to confine Plaintiffs' liability only to the requirements of Provision 1(a)(x) of the Guaranty.

We have previously determined that beginning in September 2010, numerous Events of Default occurred, each justifying the imposition of a Cash Trap Event. After the occurrence of the Events of Default, RTP distributed cash and assets in violation of the Guaranty. RTP and Inheritance are joint and severally liable for all Loses and Expenses that arose from the violation of Provision 1(a)(x) of the Guaranty. RTP and Inheritance are joint and severally liable for all Indebtedness and Obligations that arose from the violation of Provision 1(b)(ix) of the Guaranty. At this juncture, without a current accounting of all liabilities, it is premature to enter a specific judgment award as encouraged by ORIX.

## CONCLUSION

In summary, the Court denies Plaintiffs' motion for summary judgment on its claims for breach of contract (Count I), declaratory judgment (Count II), conversion (Count III), breach of implied warranty of good faith (Count IV) and declaratory judgment (Count V). The Court grants ORIX's motion for summary judgment on its claim establishing that RTP and Inheritance are joint and severally liable under the Guaranty (Count I). All motions in limine and motions to strike are hereby denied.


_____
Charles P. Kocoras
United States District Judge

September 8, 2014
Dated: _____